NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13476

MAKIS M., a juvenile <u>vs</u>.  COMMONWEALTH.


Suffolk.     January 8, 2024. - May 7, 2024.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.


<u>Delinquent Child</u>.  <u>Youthful Offender Act</u>.  <u>Due Process of Law</u>,
    Juvenile delinquency proceeding, Competency to stand trial,
    Substantive rights.  <u>Juvenile Court</u>, Delinquent child.
    <u>Incompetent Person</u>, Criminal charges.  <u>Practice, Criminal</u>,
    Juvenile delinquency proceeding, Defendant's competency,
    Dismissal.  <u>Statute</u>, Construction.  <u>Constitutional Law</u>,
    Judiciary, Separation of powers.



    <u>Civil action</u> commenced in the Supreme Judicial Court for
the county of Suffolk on July 20, 2023.

    The case was reported by <u>Wendlandt</u>, J.


    <u>Debbie F. Freitas</u> (<u>Cristina F. Freitas</u> also present) for
the juvenile.
    <u>Kristen W. Jiang</u>, Assistant District Attorney, for the
Commonwealth.
    <u>Sarah LoPresti</u>, Committee for Public Counsel Services, for
youth advocacy division of the Committee for Public Counsel
Services, amicus curiae, submitted a brief.


    GAZIANO, J.  Shortly after midnight on April 13, 2021, a

juvenile was apprehended inside an apartment building with two

guns and ammunition.  He was charged by delinquency complaint, indicted, and prosecuted by the Commonwealth for various offenses arising out of this incident.  After arraignment as a youthful offender, the juvenile was diagnosed with a language-based learning disorder, among other information-processing disorders, and two inquiries were made into his competency to stand trial.[1]

In March 2022, at the conclusion of his first competency proceeding, the juvenile was found not competent to stand trial but capable of attaining competency in the foreseeable future. The judge also considered whether the juvenile could attain competency in the foreseeable future through remediation. Remediation in this context refers to interventions designed to help the juvenile attain competency, such as special education. After being found incompetent, the juvenile twice filed motions to dismiss under G. L. c. 123, § 16 (f), the statute governing the dismissal of pending charges against incompetent persons. Both motions were denied in the fall of 2022.

In June 2023, the juvenile was again found incompetent to stand trial following a second competency proceeding.  However,

_____

[1] The juvenile was also diagnosed with borderline intellectual impairment, executive dysfunction disorder, attention deficit hyperactivity disorder, oppositional defiant disorder, a language-based learning disability, posttraumatic stress disorder, and mood dysregulation.

when asked directly by the juvenile's counsel whether "the court [was] finding [the juvenile] able to be remediated," i.e., able to attain competency in the foreseeable future, the judge declined to make a definite finding. Although the juvenile could "answer some of the questions that are germane to competency," the judge found that the competency hearing had not "focused on his ability to learn." She further found that "there is no program available in Massachusetts" that could be "beneficial to [the juvenile] with regard[] to remediating any issues of incompetency." If there were such a "remediation program that was specific to individuals with intellectual disabilities" available in the Commonwealth, the judge said, she would order the juvenile to attend that program.

In the meantime, the juvenile remains subject to numerous conditions of release and pending delinquency and youthful offender charges. The cases against him cannot move forward because he has been found incompetent to stand trial and, in the absence of any remediation programming within the Commonwealth, is not likely to attain competency in the foreseeable future.[2]

This case came before us on reservation and report of a single justice to the full court and raises three main issues.

---

[2] This is one of two opinions issued today that relate to the Commonwealth's current framework for remediating juvenile defendants found incompetent to stand trial. See Commonwealth v. Huacon, 494 Mass.    (2024).

The first issue is whether the mental health code, G. L. c. 123, provides for the remediation of incompetent juveniles, particularly those incompetent but not mentally ill.  The second issue is whether, in the absence of remediation programming under the mental health code, the ability to create and mandate remediation programming is within the scope of the Juvenile Court's inherent authority.  Lastly, this court must decide whether the pending charges against the juvenile can be dismissed under G. L. c. 123, § 16 (f), "in the interest of justice."

To the first issue, we agree with both parties that G. L. c. 123, §§ 15 and 16, do not provide for the remediation of juveniles found incompetent for reasons other than mental illness.  To the second issue, we reject the Commonwealth's contention that the ability to create and mandate remediation programming for incompetent juveniles falls within the purview of the Juvenile Court's inherent authority.  Rather, the creation of remediation programming falls within the purview of the Legislature.  To the last issue, that of dismissal under G. L. c. 123, § 16 (f), we remand this matter to the Juvenile Court for further findings on whether the juvenile poses a present danger to the community.[3]

---

[3] We acknowledge the amicus brief submitted by the youth advocacy division of the Committee for Public Counsel Services.

1.  <u>Facts</u>.  Our discussion of the facts draws from the parties' comprehensive statement of facts, prepared pursuant to the reservation and report of the single justice on August 7, 2023, as well as the record.

In the early morning hours of April 13, 2021, police investigated a breaking and entering at a residential apartment building.  At the scene, investigators apprehended the juvenile and an adult, who were in possession of a large capacity firearm, a loaded firearm with a defaced serial number, and a significant amount of ammunition.

Later that day, the juvenile was charged by delinquency complaint with seven offenses:  breaking and entering a building in the nighttime to commit a felony, G. L. c. 266, § 16; carrying a loaded firearm without a license, G. L. c. 269, § 10 (<u>n</u>); two counts of possession of a large capacity firearm, G. L. c. 269, § 10 (<u>m</u>); possession of ammunition without a firearm identification card, G. L. c. 269, § 10 (<u>h</u>); defacing a firearm serial number, G. L. c. 269, § 11C; and possession of burglarious instruments, G. L. c. 266, § 49.  The juvenile was arraigned the same day and entered a plea of not delinquent.  At his arraignment, the Commonwealth moved for the pretrial detention of the juvenile under G. L. c. 276, § 58A, on the basis of dangerousness.  Three days later, the judge allowed this motion and detained the juvenile.

On July 1, 2021, an Essex County grand jury indicted the juvenile as a youthful offender on two firearms charges, G. L. c. 269, § 10 (a). He was arraigned on July 15, 2021, and entered a plea of "not youthful offender." Again, the Commonwealth moved for the pretrial detention of the juvenile under § 58A on the basis of dangerousness and, again, the juvenile was ordered detained.

After 140 days of detention, on August 31, 2021, the judge released the juvenile under eight conditions, including "home lockdown" and the use of global positioning system services to track his location. Two more conditions were added to the juvenile's release in October 2021. However, on November 23, 2021, a notice of a technical violation of probation was issued for the juvenile. The next day, the juvenile was detained and held for another 125 days.

After counsel for the juvenile raised concerns, two inquiries were made into the juvenile's competency. The juvenile was first found incompetent to stand trial on March 28, 2022, after a series of hearings beginning on February 15, 2022. These hearings included the testimony of three expert witnesses, two for the juvenile and one for the Commonwealth. In their reports, the experts noted that the juvenile had previously been diagnosed with attention deficit hyperactivity disorder, oppositional defiant disorder, a language-based learning

disability, posttraumatic stress disorder, and mood dysregulation. They also weighed the juvenile's neuropsychological evaluation, which indicated that the juvenile had been enrolled in an individualized education program at school from a young age and "overall [was] functioning in the borderline range cognitively and academically." Ultimately, the judge found the juvenile incompetent, noting that the juvenile did not understand the role of the jury.

In her written findings, the judge further found that it was likely the juvenile would attain competency to stand trial within a reasonable period of time. She based this conclusion on the report of the Commonwealth's expert, as well as the juvenile's neuropsychological evaluation. The juvenile was released the next day with six further conditions added to his existing conditions of release.

After this initial finding of incompetency, the juvenile moved to dismiss his pending delinquency charges pursuant to G. L. c. 123, § 16 (f), in September 2022. Given both the March 2022 finding of incompetency and the implications of his impending eighteenth birthday (in late November 2022) on his pending delinquency charges, the juvenile requested that his next competency hearing be scheduled as soon as possible. The juvenile filed a renewed motion to dismiss his pending

delinquency charges pursuant to G. L. c. 123, § 16 (f), in November 2022, which was denied later that month.

The juvenile was found incompetent to stand trial for the second time on June 6, 2023, by the same judge, following extended competency proceedings that included the testimony of the same three experts. One of the juvenile's experts diagnosed him with borderline intellectual impairment and executive dysfunction, along with his preexisting diagnoses. She explained that, while the juvenile may be able to "remember definitions" or "memorize some of the factual knowledge," it was nevertheless "unlikely that his rational understanding and his ability to help his attorney is going to change." In their evaluations, the two experts for the juvenile opined that the juvenile could not be remediated, and all three experts noted deficits in his understanding. The judge also took judicial notice of the fact that the juvenile had been found incompetent to stand trial at two prior juvenile matters in May 2018 and November 2018.

At the conclusion of this second proceeding, the judge found the juvenile "not competent to stand trial" and focused her findings on his ability to remediate. Although there was a "difference of opinions" among the experts as to the juvenile's ability to remediate, the judge found that the juvenile "does seem to be able to answer some of the questions that are germane

to competency." In lieu of making any further findings about the juvenile's ability to remediate at this juncture, the judge found "that he [had not] been assigned the tools that might" aid him in attaining competency to stand trial -- in other words, "[n]obody is teaching him, for lack of a better way to say it." The judge went on to find that there was no program available in Massachusetts that may "remediat[e] any issues of competency." The judge further stated, "If there was, in Massachusetts, a remediation program that was specific to individuals with intellectual disabilities, I would be assigning him to that program to see if experts at that program found it to be beneficial to establishing competency." Ultimately, the judge declined to dismiss without "fully vett[ing] all of the opportunities for [the juvenile] to be remediated," reasoning that the charges "are of grave concern to public safety and the community" and finding the juvenile "to be a danger."[4]

On July 20, 2023, the juvenile filed a petition with a single justice of this court pursuant to G. L. c. 211, § 3. He challenged the judge's finding of remediability, as well as her decision not to dismiss the pending charges against him under G. L. c. 123, § 16 (f), and he raised novel questions of law.

---

[4] The same day, the Commonwealth moved to revoke the juvenile's release into the community because he had missed curfew by one hour. The Juvenile Court denied the motion but added an additional three conditions to the juvenile's release.

The single justice reserved and reported this matter to the full court, pairing this case with Commonwealth v. Huacon, 494 Mass.    (2024), for argument.

2.  Discussion.  First, we discuss the Commonwealth's current statutory framework for assessing competency, G. L. c. 123, §§ 15 and 16.  We next determine whether this framework empowers the Juvenile Court to create and mandate remediation programming.  In the alternative, we consider whether the ability to create and mandate remediation programming falls within the inherent authority of the Juvenile Court.  Last, we determine whether the pending case against this juvenile, who has been found incompetent and who may be capable of remediation, demands dismissal under G. L. c. 123, § 16 (f).

a.  Framework for assessing competency.  "It has long been the law of this Commonwealth that the 'trial, conviction or sentencing of a person charged with a criminal offence while he is legally incompetent violates his constitutional rights of due process,' . . . whether under the Fourteenth Amendment of the Constitution of the United States or under art. 12 of the Declaration of Rights of the Constitution of this Commonwealth." Commonwealth v. Hill, 375 Mass. 50, 51-52 (1978), quoting Commonwealth v. Vailes, 360 Mass. 522, 524 (1971).

> "This prohibition helps to protect the accuracy and reliability of criminal and delinquency proceedings by ensuring that criminal defendants and juveniles have the

> ability and opportunity to communicate information to others that may reveal their innocence or lessen their degree of guilt.  It also safeguards other constitutional rights, 'including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.'" (Citations omitted.)

Matter of a Juvenile, 485 Mass. 831, 835 (2020).  In order to be found competent, a criminal defendant must have sufficient ability "to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him."  Commonwealth v. Beatty, 492 Mass. 118, 125 (2023), quoting Commonwealth v. Russin, 420 Mass. 309, 317 (1995).  The Commonwealth bears the burden of proving the defendant's competency by a preponderance of the evidence.  Commonwealth v. Robinson, 493 Mass. 718, 724 (2024).

Pretrial competency determinations in all "court[s] of competent jurisdiction" in Massachusetts, including the Juvenile Court, are governed by G. L. c. 123, §§ 15 and 16.  See G. L. c. 123, § 15 (f) (applying to "alleged delinquent").  Where there is doubt that a defendant can stand trial due to "mental illness or mental defect," a judge may order that the defendant be examined by a qualified psychologist or physician.  G. L. c. 123, § 15 (a).  Following this initial examination, the court may then order the defendant to be hospitalized for no more than

forty days for "observation and further examination" to determine "whether mental illness or mental defect have so affected a person that he is not competent to stand trial." G. L. c. 123, § 15 (b). At the end of this observation period, the examining physician or psychologist then must provide the court with a written report of findings. See G. L. c. 123, § 15 (c). If the defendant is deemed competent, the case continues as usual. See G. L. c. 123, § 15 (d). If the defendant is deemed incompetent, the "trial of the case shall be stayed until such time as the defendant becomes competent to stand trial, unless the case is dismissed." Id. See generally Garcia v. Commonwealth, 487 Mass. 97, 106 n.15 (2021) (describing initial competency determination process provided by G. L. c. 123, § 15).

If the defendant is deemed incompetent by reason of mental illness, specifically, see G. L. c. 123, § 8, the superintendent of the examining hospital facility may then petition for the incompetent defendant to be civilly committed, pretrial, for up to six months. See G. L. c. 123, § 16 (b). From there, a mentally ill defendant may be civilly committed, again pretrial, for additional one-year periods if certain requirements under G. L. c. 123, §§ 7 and 8, are met -- i.e., where "the failure to hospitalize would create a likelihood of serious harm by reason of mental illness." G. L. c. 123, § 7 (a). See, e.g., G. L.

c. 123, § 8 (commitment where person is "mentally ill," and their discharge would "create a likelihood of serious harm"). See G. L. c. 123, § 16 (c).  See generally Matter of E.C., 479 Mass. 113, 117 (2018) (describing process of civil commitment under G. L. c. 123, § 8).

b.  Authority of the Juvenile Court to order remediation. Drawing from this statutory framework for assessing juvenile competency, the juvenile argues that G. L. c. 123, §§ 15 and 16, do not provide for remediation programming in any circumstance. The Commonwealth agrees that the statutory framework does not currently provide for remediation.  The Commonwealth instead advances that the power to create and mandate remediation programing falls within the scope of the Juvenile Court's inherent authority.  We first address whether the statutory framework allows for remediation programming.  Next, we determine whether the ability to create and mandate remediation programming falls within the inherent authority of the Juvenile Court.  In both inquiries, we answer in the negative.

i.  Statutory authority.  "Our primary duty in interpreting a statute is to effectuate the intent of the Legislature in enacting it" (quotation and citation omitted).  Sheehan v. Weaver, 467 Mass. 734, 737 (2014).  In determining the Legislature's intent, we start with the statutory language and read for internal consistency.  See Matter of E.C., 479 Mass. at

118.  See also Felix F. v. Commonwealth, 471 Mass. 513, 516 (2015).  "Ordinarily, where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent." Matter of E.C., supra, quoting Malloch v. Hanover, 472 Mass. 783, 788 (2015).  In the absence of statutory definitions, we read the words of a statute to have their "plain and ordinary meaning."  Matter of E.C., supra.  Where the meaning of statutory language is ambiguous, we turn to the legislative history to determine the Legislature's intent.  See id.  If we determine that statutory language is unknowably ambiguous or "faulty or lacks precision, it is our duty to give the statute a reasonable construction" (citation omitted).  Commonwealth v. Keefner, 461 Mass. 507, 511 (2012).

By its plain language, the function of G. L. c. 123, § 15, is to provide procedures to determine a person's competency -- not to remediate incompetency.  See Commonwealth v. Carson C., 489 Mass. 54, 57-58 (2022) (competency of "adult or juvenile" defendants evaluated under G. L. c. 123, § 15).  See, e.g., G. L. c. 123, § 15 (a) (authorizing court to enlist "one or more qualified physicians or . . . psychologists" to conduct examination to "determin[e] mental competence to stand trial"); G. L. c. 123, § 15 (b) (male defendant requiring stricter security can be hospitalized "if the court has reason to believe that such observation and further examination are necessary in

order to determine whether mental illness or mental defect" renders person incompetent [emphasis added]); G. L. c. 123, § 15 (d) (if necessary, court "shall hold a hearing on whether the defendant is competent"). In the instant case, the juvenile has already been found incompetent. Because G. L. c. 123, § 15, does not provide for observation or examination beyond the point of determining whether a defendant is competent, it does not provide a vehicle for remediation programming.

The question then becomes whether G. L. c. 123, § 16 (b), allows the Juvenile Court to order the juvenile to be civilly committed for purposes of remediation. Importantly, G. L. c. 123, § 16, by reference to G. L. c. 123, § 8, requires that a juvenile be "mentally ill" to be civilly committed. See, e.g., Matter of Hernandez, 101 Mass. App. Ct. 856, 860, 869-870 (2022) (defendant incompetent by reason of mental illness for purposes of civil commitment due to, among other factors, psychosis and schizophrenia); Matter of D.K., 95 Mass. App. Ct. 95, 96-97 (2019) (defendant incompetent by reason of mental illness for purposes of civil commitment due to, among other factors, schizophrenia, delusions, and perceptual disturbances). Here, the juvenile has been diagnosed with a language-based learning disability, among other information-processing disorders, which both parties agree are distinct from mental illness as that term is defined by regulation. See 104 Code Mass. Regs. § 27.05(1)

(2021) (defining mental illness for purposes of involuntary commitment as "a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life, but shall not include intellectual or developmental disabilities, autism spectrum disorder, traumatic brain injury or psychiatric or behavioral disorders or symptoms due to another medical condition").[5]  The juvenile is not incompetent by reason of mental illness but, rather, by the effect of his numerous diagnoses on his ability to understand the role of a jury and otherwise assist his attorney, such that the discussion of civil commitment in § 16 is inapplicable to the issue of remediation here.  Cf. Commonwealth v. DelVerde, 401 Mass. 447, 449-450 (1988) (when "depression, coupled with [intellectual impairment], severely affect[s] . . . behavior and mood," mental condition can qualify as mental illness for purposes of civil commitment [emphasis added; footnote omitted]).  See generally G. L. c. 123B, § 1 ("no person with [either] a developmental disability [or an intellectual disability] shall be considered to be mentally ill

---

[5] The Department of Mental Health promulgated this definition pursuant to its authority under G. L. c. 123, § 2, to "define the categories of mental illness for the purpose of [c. 123]."  See generally District Court Standards of Judicial Practice:  Civil Commitment and Authorization of Medical Treatment for Mental Illness (rev. Apr. 2019).

solely by reason of the person's developmental [or intellectual] disability").

Because G. L. c. 123, § 15, only allows for examination of a juvenile defendant in order to determine competency, rather than to remediate incompetency, and because civil commitment under G. L. c. 123, § 16, requires that a juvenile be mentally ill, not otherwise impaired, the mental health code provides neither for the remediation of incompetent defendants nor for the commitment of those incompetent due to reasons other than mental illness.

ii. Inherent authority. In the absence of a statute providing for remediation, the Commonwealth argues that the Juvenile Court is empowered to create and mandate remediation programming pursuant to its inherent authority. However, the creation of remediation programming for incompetent juveniles strays beyond the bounds of the Juvenile Court's inherent authority and is best left to the Legislature. See generally Spinelli v. Commonwealth, 393 Mass. 240, 243 (1984) ("The Legislature may, in some circumstances, provide a legislative remedy where the courts have determined there is no judicial remedy").

Inherent judicial powers flow from the "lofty principles" secured by arts. 11 and 29 of the Massachusetts Declaration of Rights, guaranteeing residents the impartial administration of

justice.  First Justice of the Bristol Div. of the Juvenile Court Dep't v. Clerk-magistrate of the Bristol Div. of the Juvenile Court Dep't, 438 Mass. 387, 396-397 (2003).  See Bower v. Bournay-Bower, 469 Mass. 690, 698 (2014), quoting Sheriff of Middlesex County v. Commissioner of Correction, 383 Mass. 631, 636 (1981) ("We have long recognized that courts in this Commonwealth possess certain inherent powers whose exercise is 'essential to the function of the judicial department, to the maintenance of its authority, or to its capacity to decide cases'").  The judiciary's inherent authority is to be invoked only when established methods fail, Brach v. Chief Justice of the Dist. Court Dep't, 386 Mass. 528, 536 (1982), and its scope is concurrent with its purpose:  "to allow judges to perform core functions necessary for the proper administration of justice," Campatelli v. Chief Justice of the Trial Court, 468 Mass. 455, 476 (2014) (includes supervisory authority over personnel within judicial system).  See Commonwealth v. Teixeira, 475 Mass. 482, 483 (2016) (includes authority to order prehearing discovery); Gray v. Commissioner of Revenue, 422 Mass. 666, 672-673 (1996) (includes authority to grant change of venue, to use contempt proceedings, to appoint guardian ad litem, to impound files, and to revoke judgment obtained by fraud); Chief Admin. Justice of the Trial Court v. Labor Relations Comm'n, 404 Mass. 53, 57 (1989) (includes authority to

control court room proceedings); O'Coin's, Inc. v. Treasurer of the County of Worcester, 362 Mass. 507, 510 (1972) (includes rulemaking and administrative authority, as well as authority to commit fiscal resources to operation of court system).

The establishment of pretrial remediation programming for incompetent juveniles strays beyond the bounds of the "internal functioning of the judiciary" and therefore beyond the scope of the court's inherent authority. Commonwealth v. Dodge, 428 Mass. 860, 866 (1999) (ability to impose conditions on pretrial release is not essential to judicial function and therefore is beyond scope of inherent authority). A similar issue arose in Department of Mental Retardation v. Kendrew, 418 Mass. 50, 54-55 (1994).[6] There, a District Court judge was confronted with a criminal defendant who was incompetent to stand trial by reason of intellectual impairment. Id. While the District Court could not commit the defendant under G. L. c. 123, § 16, as she was not mentally ill, the trial judge instead used his authority to place the defendant in a long-term residential treatment program. See id. at 54. On review, we acknowledged that although "courts of the Commonwealth have certain inherent and implied powers," this "legislative 'gap' or 'crack' was not

_____

[6] The department has since been renamed the Department of Developmental Services. See Judge Rotenberg Educ. Ctr., Inc. v. Commissioner of the Dep't of Developmental Servs., 492 Mass. 772, 778 n.8 (2023).

within a court's [inherent] power to fill." Id. at 55. Because the order was neither "authorized by a necessary and inevitable implication of the court's power to decide criminal cases and impose penalties" nor "an ancillary function in the nature of rule-making or judicial administration," it strayed beyond the bounds of the District Court's authority. Id. at 55-56. Accordingly, we vacated the trial judge's order. See id. at 57.

Again here, crafting remediation programming for juveniles goes beyond the court's inherent authority and requires a level of policy-making typically reserved for the Legislature. See Kendrew, 418 Mass. at 55-56. See also Hancock v. Commissioner of Educ., 443 Mass. 428, 466-467 (2005) (Cowin, J., concurring) (separation of powers demands "that the judiciary stay out of the business of educational policy"). The existence of "gap[s]" in G. L. c. 123, §§ 15 to 16, such that the statutes fail to provide for the remediation of incompetent juveniles and provide for the civil commitment only of the mentally ill, does not empower Juvenile Court judges to take matters into their own hands in the name of resolving criminal cases efficiently. Kendrew, supra. See Matter of a Juvenile, 485 Mass. at 835 (prohibition on trying incompetent defendants central to "accuracy and reliability of criminal and delinquency proceedings").

Indeed, as recently as 2023, the Legislature proposed a bill specifically addressing the remediation of incompetent juveniles. See House Bill No. 1554, § 4 (Jan. 20, 2023) (would add new section, G. L. c. 123, § 15A, providing that if juvenile is incompetent but capable of remediation, "the court shall stay the proceedings and order the youth to receive services designed to achieve competence"). See generally Commonwealth v. Clerk of the Boston Div. of the Juvenile Court Dep't, 432 Mass. 693, 699 (2000), quoting School Comm. of Worcester v. Worcester Div. of the Juvenile Court Dep't, 410 Mass. 831, 834 (1991) ("[j]uvenile courts, like all the courts of the Commonwealth, except the Supreme Judicial Court, are creatures of the Legislature and derive their powers, other than those powers that are inherent in all courts . . . from the Legislature"). The proposed bill would, inter alia, repeal part of G. L. c. 123, § 15, and insert a new section following it, in order to, among other goals, provide additional guidance for initial competency determinations, vest courts with the authority to order remediation programming, and offer different routes to dismissal for irremediable juveniles based upon their different predicate offenses. See House Bill No. 1554, §§ 3, 4.[7]

---

[7] We note that the bill would repeal a portion of G. L. c. 123, § 15, and add a new § 15A to "reform[] juvenile offender law." See House Bill No. 1554 (titled "An Act reforming juvenile offender law"). It is noteworthy that this proposed

Our Legislature would not be alone in acting on the issue of juvenile incompetency and remediation -- rather, remediation programs across the country have begun with State legislatures and reflect the complex policy considerations involved. For instance, States differ as to whether remediation programming is crafted by the court on a defendant-by-defendant basis, see, e.g., Cal. Welf. & Inst. Code § 709(g)(2) ("court may make any orders necessary to assist with the delivery of remediation services in an alternative setting to secure confinement"), or simply ordered by the court and then provided by a predetermined agency within the State, see, e.g., Me. Rev. Stat. tit. 15, § 3318-B (juvenile court shall "refer the juvenile to the

---

legislation from the 2023 session is not the first of its kind. See House Bill No. 1665 (Feb. 18, 2021).

Material here, if a juvenile is ultimately found not competent but capable of remediation, the court would be empowered under the proposed law to stay proceedings, order the juvenile to receive services, and review his or her progress every 180 days. See House Bill No. 1554, § 4 (proposed G. L. c. 123, § 15A [d]).

From there, the bill varies the procedure for dismissal by predicate offense. For instance, misdemeanor charges are to be dismissed if the juvenile has not remediated after 180 days, but felony charges would only be dismissed if the juvenile has not remediated within two years. See House Bill No. 1554, § 4 (proposed G. L. c. 123, § 15A [e]-[f]). In the case of a juvenile charged with murder, the court would retain jurisdiction for five years or until the juvenile reaches twenty-one years of age, and only then would the pending charges be subject to dismissal if the juvenile remains not competent. See House Bill No. 1554, § 4 (proposed G. L. c. 123, § 15A [g]).

Commissioner of Health and Human Services for evaluation and treatment"); N.C. Gen. Stat. § 7B-2401.4(g) (effective Jan. 1, 2025) ("The Division [of Juvenile Justice and Delinquency Prevention of the Department of Public Safety] shall be responsible for the provision of psychoeducation remediation programming . . ."); Utah Code Ann. § 80-6-403(1) (if juvenile determined not competent, "the juvenile court shall notify the [Department of Health and Human Services]" and "allow the department [thirty] days to develop an attainment plan for the minor"). Regardless of approach, State statutes on this topic provide courts and agencies alike with the necessary authority and guidance to proceed. See, e.g., Alaska Stat. § 12.47.110 (allowing court to commit incompetent defendants to State agency, providing timelines for remediation, and discussing how dismissal is affected by severity of predicate offense).

Altogether, the power to create and mandate remediation programming for juveniles found incompetent to stand trial falls beyond the scope of the Juvenile Court's inherent authority, such that this responsibility is best left to the Legislature.

c. _Application and appropriate remedy_. Pending delinquency charges are not currently subject to dismissal under G. L. c. 123, § 16 (f). See Sharris v. Commonwealth, 480 Mass. 586, 594 (2018) ("G. L. c. 123, § 16 (f), implicitly excludes dismissal of charges" that would "never be eligible for

parole").  See also <u>Abbott A</u>. v. <u>Commonwealth</u>, 458 Mass. 24, 39 n.16 (2010) (delinquency charges involve neither criminal sentencing nor parole).  The juvenile therefore argues that fundamental fairness and due process require that G. L. c. 123, § 16 (<u>f</u>), allow for the dismissal of pending delinquency charges.  In opposition, the Commonwealth relies on the public safety threat posed by the juvenile.

i.  <u>General Laws c. 123, § 16 (f)</u>.[8]  The mental health code provides two avenues to dismissal under G. L. c. 123, § 16 (<u>f</u>), "[i]f a person is found incompetent to stand trial," such as the juvenile here.  See <u>Sharris</u>, 480 Mass. at 593 ("General Laws c. 123, § 16 (<u>f</u>), is intended to ensure that [persons] who are incompetent to stand trial are not left facing the indefinite pendency of criminal charges").  First, the case against an

---

[8] General Laws c. 123, § 16 (<u>f</u>), provides:

"If a person is found incompetent to stand trial, the court shall send notice to the department of correction which shall compute the date of the expiration of the period of time equal to the time of imprisonment which the person would have had to serve prior to becoming eligible for parole if he had been convicted of the most serious crime with which he was charged in court and sentenced to the maximum sentence he could have received, if so convicted. For purposes of the computation of parole eligibility, the minimum sentence shall be regarded as one half of the maximum sentence . . . .  On the final date of such period, the court shall dismiss the criminal charges against such person, or the court in the interest of justice may dismiss the criminal charges against such person prior to the expiration of such period."

incompetent person can be dismissed after the expiration of half of the time it would have taken for the defendant to become eligible for parole had they received the maximum possible sentence. See G. L. c. 123, § 16 (f); Foss v. Commonwealth, 437 Mass. 584, 585 (2002). In the alternative, charges against a person found incompetent to stand trial can be dismissed "in the interest of justice." G. L. c. 123, § 16 (f). We have discussed the "in the interest of justice" prong of G. L. c. 123, § 16 (f), in two main cases: Commonwealth v. Calvaire, 476 Mass. 242, 247 (2017); and Sharris, 480 Mass. at 601-602.

In Calvaire, 476 Mass. at 243-246, we held that a pending case against an incompetent person can be dismissed "in the interest of justice" under the second prong of G. L. c. 123, § 16 (f), "even before the maximum parole eligibility date has been reached" under the first prong of G. L. c. 123, § 16 (f). We explained that the "interest of justice" language of § 16 (f) provides a "safety valve" for dismissal where it is unlikely that a defendant will regain competency for trial -- for example, where "the defendant's chances of being restored to competency are slim." Id. at 247. In this way, the provision "safeguard[s]" the two compelling State interests served by the statute: (1) protecting incompetent persons from indefinitely pending criminal charges and (2) protecting the public from potentially dangerous persons. Id. at 246. In deciding whether

to dismiss "in the interest of justice," we explained that judges are empowered to consider factors outside of the statutory framework of G. L. c. 123. Id. For instance, we weighed in favor of dismissal the fact that the defendant was "deemed incompetent for more than half of the time since the charge was brought in [his] case." Id. at 247 n.13.

The following year, in Sharris, 480 Mass. at 593-595, this court ordered the dismissal of pending charges "in the interest of justice" even where the defendant was not eligible for parole and therefore "implicitly exclude[d]" from dismissal under G. L. c. 123, § 16 (f). Because "a defendant's liberty interests during the pendency of a criminal trial are fundamental rights," we undertook a substantive due process analysis and applied strict scrutiny. Id. at 597. When we analyzed the two compelling State interests identified in Calvaire, 476 Mass. at 246, we looked to whether the defendant posed a present danger to public safety, rather than considering his history of violence. See Sharris, supra at 599. Ultimately, we held that G. L. c. 123, § 16 (f), satisfies substantive due process "only insofar as it is understood to allow the dismissal of charges, in the interest of justice, in circumstances such as these, where the defendant will never regain competency and does not pose a risk to public safety." Id. at 602. In our analysis, we emphasized that "allowing charges that can never be resolved at

a trial to remain pending indefinitely is inconsistent with [the defendant's] right to substantive due process," particularly when it was "undisputed that the defendant [would] never become competent" to stand trial.  Id. at 601-602.

As these cases demonstrate, to decide the issues before us today we must first assess whether a juvenile offender is eligible for parole.  See Sharris, 480 Mass. at 593-595; Calvaire, 476 Mass. at 243-246.  The first prong of the statute explicitly calculates a dismissal date using the defendant's parole eligibility, and the second prong allows for dismissal "in the interest of justice . . . prior to the expiration of such period [calculated under the first prong]."  G. L. c. 123, § 16 (f).  Here, the juvenile faces both delinquency and youthful offender charges.  As noted supra, delinquency charges are "implicitly exclude[d]" from dismissal under G. L. c. 123, § 16 (f), because they involve neither criminal sentencing nor parole.  See Sharris, supra at 594.  See also Abbott A., 458 Mass. at 39 n.16.  Youthful offender charges, on the other hand, can be sentenced in one of three ways:  the juvenile can be sentenced as an adult, the juvenile can be committed to the Department of Youth Services until the age of twenty-one, or the juvenile can receive a "combination sentence" of commitment to the Department of Youth Services followed by probation and an adult sentence.  G. L. c. 119, § 58 (a)-(c).  See Commonwealth

v. Terrell, 486 Mass. 596, 599-600 (2021).  There is no way to know which avenue the judge would have taken in sentencing here and, importantly for purposes of G. L. c. 123, § 16 (f), whether the juvenile's sentence would have involved parole.

Therefore, because the juvenile is not eligible for dismissal of his delinquency charges and may not be eligible for dismissal of his youthful offender charges, depending on sentencing, "[w]e analyze his claim on substantive due process grounds."  Sharris, 480 Mass. at 594.  Where indefinitely pending charges burden a fundamental liberty interest, we apply strict scrutiny.  See id. at 595-602 ("a defendant's liberty interests during the pendency of a criminal trial are fundamental rights," triggering strict scrutiny).  See Commonwealth v. Weston W., 455 Mass. 24, 35 (2009) (for statute to satisfy strict scrutiny, it "must be narrowly tailored to further a legitimate and compelling governmental interest and be the least restrictive means available to vindicate that interest").

ii.  Substantive due process.  A.  Liberty interest. Although the juvenile is in the community, he claims his liberty is impaired by "his many conditions of release and the continued pendency of the [youthful offender and delinquency] charges against him."  In both Calvaire, 476 Mass. at 243, and Sharris, 480 Mass. at 587, the defendant was subject to civil commitment.

However, physical detention is not necessary to show that a juvenile's liberty interest has been burdened -- indeed, "the United States Supreme Court has determined that a defendant's liberty interest may be restricted simply by the pendency of criminal changes, even where the defendant is not held in custody." Sharris, supra at 597.

The fact that the juvenile is subject to indefinitely pending charges further establishes the burden upon his liberty and triggers a substantive due process analysis. See Jackson v. Indiana, 406 U.S. 715, 740 (1972) ("denial of due process inherent in holding pending criminal charges indefinitely over the head of one who will never have a chance to prove his innocence").[9] Three main factors render the charges against the juvenile indefinite. First, the juvenile is incompetent and, because there is no remediation programming available in the Commonwealth, cannot be expected to attain competency and stand trial in the foreseeable future. See Kendrew, 418 Mass. at 55-56. Second, because the Juvenile Court retains jurisdiction over the juvenile "pending final adjudication," and because the juvenile's case cannot be finally adjudicated while the juvenile remains incompetent, the juvenile cannot age out of these

---

[9] Because the juvenile focuses on the pending delinquency charges and the second prong of G. L. c. 123, § 16 (f), we limit our analysis to these issues.

proceedings. G. L. c. 119, § 72 (a) ("The divisions of the juvenile court department shall continue to have jurisdiction over children who attain their eighteenth birthday pending final adjudication of their cases . . ."). See generally Commonwealth v. Cole C., 92 Mass. App. Ct. 653, 659 (2018) (G. L. c. 119, § 72, "recognized that the Juvenile Court retains jurisdiction over cases that were pending when the juvenile turns eighteen"). Third, the pending delinquency charges against the juvenile cannot be dismissed by reason of the juvenile's incompetency, as they do not involve parole and are therefore "implicitly exclude[d]" from dismissal under G. L. c. 123, § 16 (f). Sharris, 480 Mass. at 594. See Abbott A., 458 Mass. at 39 n.16. For all the foregoing reasons, although the juvenile is not civilly committed and is currently living in the community, his liberty is constrained by living under indefinitely pending charges. See Jackson, supra; Sharris, supra at 597.

B. Two compelling State interests served by indefinitely pending charges. I. Protecting incompetent persons from facing indefinitely pending charges. Presently, charges have been pending against the juvenile for over two years since he was initially found incompetent in March 2022, more than half of the time since charges were first brought against him. See Calvaire, 476 Mass. at 247 n.13 (fact that defendant had "been deemed incompetent for more than half of the time since the

charge was brought" favored dismissal).  Because no remediation programming exists within the Commonwealth, supra, we conclude on this record that the juvenile is not likely to attain competency to stand trial in the foreseeable future.

In light of this fact, we hold that maintaining indefinite charges against the juvenile is not narrowly tailored to the State's interest of protecting incompetent persons from facing indefinitely pending charges.  See Foss, 437 Mass. at 589 (mental health code was promulgated, in part, to "eliminat[e] the indefinite pendency of criminal charges" against incompetent defendants "awaiting their unlikely restoration to competency").  The rehabilitative goals of the juvenile justice system, which include minimizing interactions between juveniles and the justice system, support this conclusion.  See G. L. c. 119, § 53 ("as far as practicable, [delinquent children] shall be treated, not as criminals, but as children in need of aid, encouragement and guidance").  See also Carson C., 489 Mass. at 63 (juveniles have "significant" interest in avoiding interaction with justice system, even as early as arraignment, due to "the ramifications of criminal and delinquency records").  Cf. Abbott A., 458 Mass. at 40-41 (rule of reasonableness does not allow for incompetent juvenile's pretrial detention where it "fails to result in progress toward achieving competency or has become unreasonable in duration").

II.  Protecting the public from potentially dangerous persons.  The other compelling State interest served by maintaining pending charges against the juvenile is protecting the public from potentially dangerous persons.  See Calvaire, 476 Mass. at 246.  In Sharris, 480 Mass. at 599-600, this court analyzed the threat to public safety posed by a defendant declared incompetent to stand trial for murder in the first degree.  Regardless of the "defendant's history of violence," both before the murder and during his subsequent civil commitment, we focused our discussion on the threat posed by the defendant in the "now."  Id. at 599 (considering medical condition and concluding that "the defendant is now too physically weak to pose a danger to public safety").

Here, the judge did not make findings on the present threat to public safety posed by the juvenile.  In her analysis, she found the juvenile to be a "danger" because "[t]he charges here are of grave concern to public safety and the community." However, the judge made her findings in June 2023, and the charges arose from the April 2021 incident, marking a roughly two-year gap.  At the time of the June 2023 hearing, the juvenile had been living in the community since March 2022 under extensive conditions of release and had accrued no further criminal charges in the interim.  Neither of these factors was included in the judge's findings as to the juvenile's present

dangerousness.  Because the judge did not look to the present danger posed by the juvenile and instead focused on the underlying offense, see Sharris, 480 Mass. at 599, we remand for further findings on the juvenile's present dangerousness.

3.  Conclusion.  The current statutory framework for assessing competency, G. L. c. 123, §§ 15-16, does not provide for the remediation of incompetent juveniles.  The task of establishing and mandating remediation programming falls outside the scope of the Juvenile Court's inherent authority and is more appropriately left to the Legislature.  Finally, regarding dismissal under G. L. c. 123, § 16 (f) ("in the interest of justice"), we remand for further findings on whether the juvenile poses a present danger to the public safety.

So ordered.